IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UMER MALIK, an individual, and FAIR OAKS BLVD. LLC, | ) ) ) |
| *Plaintiffs*, | ) No. 23 C 1182 ) |
| v. | ) Judge Virginia M. Kendall ) |
| PRAIRIE RAYNOR LLC, et al., | ) ) |
| *Defendants*. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Umer Malik claims Defendants Laurena "Lori" Mikosz and Marcin Chojnacki tricked him into buying four run-down apartment buildings in Blue, Island, Illinois. While holding themselves out as Malik's real-estate brokers, Mikosz and Chojnacki allegedly fed him false assurances about the buildings' condition and profitability. Behind the scenes, Mikosz's and Chojnacki's associates, the remaining Defendants, through "puppet entities," bought the buildings and resold them to Malik at a significant markup. Malik, and his company, Plaintiff Fair Oaks Blvd. LLC sued, alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 5). Defendants now move to dismiss. (Dkts. 59, 62). For the reasons below, the motions [59, 62] are denied.

**BACKGROUND**

In early August 2022, Plaintiff Umer Malik, a California resident, saw a social media advertisement for CitiPoint Properties ("CitiPoint"). (Dkt. 5 ¶ 18).[1] According to the advertisement, CitiPoint helped real-estate investors find undervalued and underperforming

---

[1] At the time, CitiPoint was an "unincorporated enterprise," organized by Defendant Marcin Chojnacki, that appeared to be a real-estate investment firm. (*Id.* at ¶ 15). Later, on December 28, 2022, CitiPoint reorganized as Citypoint Illinois, LLC, which is owned and controlled by non-party Citypoint Group, Inc. (*Id.*)

1

properties—so-called "directly sourced" properties. (*Id.*) The advertisement promised "rapidly increasing equity and high cash flow." (*Id.*) Responding to the advertisement, Malik sent a message to CitiPoint. (*Id.*) Defendant Lori Mikosz, who was in Illinois, replied, telling Malik that her company introduces "apartment building owners" to investors. (*Id.* at ¶ 20). Mikosz also told Malik that she was affiliated with Defendant Mainstreet Property Management LLC ("Mainstreet"), a property-management company. (*Id.* at ¶ 21). Mikosz explained that Malik could invest in a building that was underperforming due to its ownership and self-management by a local, unprofessional landlord. (*Id.* at ¶¶ 22–23). By purchasing property at a bargain and using Mainstreet's property-management service, Mikosz proposed, Malik could expect "substantial cash flow." (*Id.* at ¶ 23).

On September 24, 2022, Malik traveled to Illinois to meet with Mikosz and Defendant Marcin Chojnacki. (*Id.* at ¶ 24). Chojnacki introduced himself as Mainstreet's principal and a broker of Defendant Chase Real Estate, LLC ("Chase RE"). (*Id.*) Mikosz and Chojnacki led Malik to believe that they were agents of Chase RE, a CitiPoint affiliate, and "the transactions would be safely negotiated and consummated under the auspices of Chase Real Estate." (*Id.* at ¶ 26). Both Chojnacki and Mikosz emailed Malik from email addresses at the domain, "@mychaseagent.com." (*Id.* at ¶ 27). At the time, the CitiPoint website was "a virtual reflection" of Chase RE's website. (*Id.* at ¶ 28, *see* Dkts. 5-2, 5-3).

Mikosz told Malik about "four buildings comprised of 24 residential apartment units in Blue Island, Illinois" ("the Properties"). (Dkt. 5 ¶ 29). Mikosz said that the "old couple" who owned the Properties had "limited property management skills." (*Id.*) She also told Malik that the Properties were in good condition, and all the tenants were current on their rent. (*Id.* at ¶ 30). Mikosz gave Malik a cash-flow analysis showing that Malik could turn a profit if he bought the

2

Properties for $2.1 million. (*Id.*) During the negotiations and transactions, Mikosz continued "to identify herself as Malik's agent and representative." (*Id.* at ¶ 32). Malik believed Mikosz's and Chojnacki's representations and, on November 7, 2022, entered a contract to purchase the Properties. (*Id.* at ¶ 34, *see* Dkt. 5-4).

Unbeknownst to Malik, the counterparties to the sale were not the "long-standing owners of the building"; rather, the Properties were owned by Defendant Prairie Raynor LLC ("Prairie Raynor"), an "entity indirectly controlled by Chojnacki" and managed by Defendant First National Financial, Inc. ("First National"). (Dkt. 5 ¶¶ 6, 32–33). Defendant Kathleen Long, who is Chojnacki's "paramour" and roommate, serves as First National's president and secretary. (*Id.* at ¶ 8). The purchase agreement listed Chase RE as the "Selling Office" and Mikosz as the "Buyer's Designated Agent." (*Id.* at ¶ 35). But there was no name for the seller, only an "Owner of Record." (*Id.*) The agreement represents that the "Seller has not received written notice from any governmental body or owner association regarding . . . zoning, building, fire or health code violations that have not been corrected." (*Id.* at ¶ 108; Dkt. 5-4 ¶ 10). Moreover, it states that "Seller is required to deliver assignments of leases and Rent Roll to Buyer at the time of closing." (Dkt. 5 ¶ 114; Dkt. 5-4 ¶ 11).

Between November 7, 2022 and December 20, 2022, when Malik requested proof of rent payments and their payment status, Mikosz provided verbal reassurances that the rent was fully paid and that the old couple was disorganized and could not provide financial documents. (*Id.* at ¶¶ 36–37). Mikosz deflected and wrote Malik on November 30, 2022 that "You paying (sic.) Almost $1M less of what this building is worth." (*Id.* at ¶ 38; Dkt. 5-5). Instead of providing rental financials, Mikosz provided Malik with a written statement from the old couple, confirming that all rental payments were timely. (*Id.* at ¶ 46). On December 20, 2022, Defendant Rebecca Irwin,

3

as attorney for Prairie Raynor, emailed Malik a notarized statement signed by Long "listing all units of the subject properties and identifying the payment status as current." (*Id.* at ¶ 47). During that period, Malik also learned that the real owner and seller of the Property was Prairie Raynor. (*Id.* at ¶ 39). When confronted, Mikosz stated that, according to the seller's attorney Irwin, the Properties were transferred to Prairie Raynor during an off-the-book asset restructuring done for tax purposes and that the old couple had owned the property "for years." (*Id.* at ¶¶ 39–41).

Mikosz suggested AnnMarie Siriano, a Mainstreet employee, could manage the Properties for Malik. (*Id.* at ¶ 48). On December 26, 2022, during a phone call with Malik, Siriano disclosed that the Property was not fully leased, several tenants were either in eviction proceedings or in arrears, and that Mainstreet was already managing the property. (*Id.* at ¶¶ 44, 49). Surprised, Malik called Chojnacki for confirmation. (*Id.* at ¶ 50). Chojnacki denied Siriano's statements; he assured Malik that the rent roll was valid, and Mainstreet was not managing the property. (*Id.* at ¶ 51). When Malik expressed uncertainties about closing on the purchase, Mikosz urged Malik to move forward with the agreement and reassured him of the rent roll's authenticity. (*Id.* at ¶¶ 55–58). Moreover, Mikosz said the "'old couple seller' wanted to ameliorate Malik's misgivings by offering him a $20,000 escrow fund at closing to cover any deviations from the rent roll's accuracy and cover evictions cost if any." (*Id.* at ¶ 56)

On December 29, 2022, the day of closing, Siriano told Malik that the Properties "were not cleared for transfer by the City of Blue Island because of numerous code violations." (*Id.* at ¶ 59). Malik followed up with Mikosz, who told him that the "old retiring couple seller" was willing to add $30,000 into the escrow fund to cover the repairs. (*Id.* at ¶ 60). She pressured him to follow through on the closing because this was a "very reasonable offer" and the repairs "amounted to

4

less than $6,000 in work." (*Id.* at ¶¶ 60–61) Moreover, the Seller's "willingness to put $50,000 at risk should convince [Malik]" that they were not making any misrepresentations. (*Id.* at ¶ 61).

On that same day, Malik closed on the contract and his LLC, Plaintiff Fair Oaks Blvd. LLC ("Fair Oaks"), acquired title to the Properties for the purchase price of $2.1 million. (*Id.* at ¶ 62). Prairie Raynor gave Chase RE a commission from the sale. (*Id.* at ¶ 95). Throughout the dealings with Malik, Irwin acted on behalf of Prairie Raynor and Defendant Midwest Title and Closing Services LLC ("Midwest Title"). (*Id.* at ¶ 67). Through Midwest Title, Irwin provided "registered agent services to the various puppet entities"; she housed "various legal operations" relating to the entities and deals; and she charged Malik a fee for "closing coordination." (*Id.* at ¶ 68). Midwest Title—managed by nonparty XYZABC, Inc., of which Irwin is the president—shares office space with Irwin, Chojnacki, Mikosz, Mainstreet, and Defendant EJ Investment Group Inc. ("EJ Investment"), which owns and controls Mainstreet. (*Id.* at ¶¶ 10–14, 69).

After taking ownership, Malik learned that the Properties had not been owned by "an old retiring couple" for a long time—if ever. (*Id.* at ¶ 63). Nor did Defendants follow Blue Island inspection and real estate transfer requirements. (*Id.* at ¶ 75). For months before the deal, the city had "direct[ed] building code violations at the Defendants." (*Id.* at ¶ 74). As a result, Blue Island suspended the Properties' occupancy certifications and prevented Malik from renting out units. (*Id.* at ¶ 76). Many of the Properties' units were vacant or had tenants involved in eviction proceedings or arrears. (*Id.* at ¶¶ 44, 49). Moreover, Prairie Raynor purchased the Properties for $1,550,000 in January 2022—eleven months before Malik closed on the sale. (*Id.* at ¶¶ 63–64). Defendants have tried to "repeat the scam" by offering Malik additional properties. (*Id.* at ¶ 77). Defendants have allegedly scammed at least four other investors like Malik. (*Id.* at ¶¶ 78–79).

5

Malik filed this suit on February 24, 2023, (Dkt. 1), and amended his complaint on March 2, 2023, (Dkt. 5).[2] In Count I of the Amended Complaint, Malik alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c), (d). (*Id.* at ¶¶ 80–99). Count II is a common-law fraud claim against Mikosz, Chojnacki, and Irwin. (*Id.* at ¶¶ 100–06). Count III is a breach of contract claim for false representations as to the building code violations against Prairie Raynor. (*Id.* at ¶¶ 107–12). Count IV(A) is a breach of contract claim for falsified rent rolls against Prairie Raynor. (*Id.* at ¶¶ 113–20).[3] Count IV(B) alleges Mikosz, Chojnacki, Long, and Irwin violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq*. (*Id.* at ¶¶ 121–27). And Count V alleges Mikosz, Chojnacki, and Chase RE violated the Illinois Real Estate License Act (IRELA), 225 ILCS 454/1 *et seq.* (*Id.* at ¶¶ 128–34). In Count VI, Malik brings a negligent-misrepresentation claim against Mikosz, Chojnacki, Long, and Irwin. (*Id.* at ¶¶ 135–141). Chase RE, joined by the remaining Defendants, now moves to dismiss the Amended Complaint for failure to state a claim. (Dkt. 59; *see also* Dkts. 60–61, 63–64, 67). Separately, First National, Prairie Raynor, and Long move to dismiss Counts III and IV for failure to state a claim. (Dkt. 62).

## LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

---

[2] This is one of eleven related actions proceeding before this Court. *See* Complaint, *Shankar v. Fairview Ave. Props. LLC*, No. 23-cv-01469 (N.D. Ill. Mar. 9, 2023); Complaint, *Abbas v. Mikosz*, No. 23-cv-01691 (N.D. Ill. Mar. 17, 2023); Complaint, *Sor v. TCF Nat'l Holdings, Inc.*, No. 23-cv-02401 (N.D. Ill. Apr. 18, 2023); Complaint, *Chen v. Chojnacki*, No. 23-cv-02520 (N.D. Ill. Apr. 21, 2023); Complaint, *Michel v. Chojnacki*, No. 23-cv-02546 (N.D. Ill. Apr. 24, 2023); Complaint, *Said v. Chojnacki*, No. 23-cv-02858 (N.D. Ill. May 5, 2023); Amended Complaint, *Haynes v. Fairview Avenue Properties, LLC*, No. 23-cv-01596 (N.D. Ill. May 16, 2023); Complaint, *Stafford v. Chojnacki*, No. 23-cv-03173 (N.D. Ill. May 19, 2023); Complaint, *Hui v. Chojnacki*, No. 23-cv-03430 (N.D. Ill. May 31, 2023); Complaint, *Fernandez v. Chojnacki*, No. 23-cv-04406 (N.D. Ill. July 7, 2023).
[3] In his Amended Complaint, Malik referenced Count IV twice. To avoid confusion, the Court will distinguish the counts as Count IV(A) and Count IV(B).

*Russell v. Zimmer, Inc.*, 82 F.4th 564, 570 (7th Cir. 2023) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

For claims sounding in fraud, Federal Rule of Civil Procedure 9(b) requires plaintiffs to "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)).

## DISCUSSION

**I.     Racketeer Influenced and Corrupt Organizations Act (RICO) (Count I)**

In Count I, Malik alleges that Chojnacki, Mikosz, Long, Prairie Raynor, Citypoint Illinois, Mainstreet, First National (collectively, "the § 1962(c) Defendants") violated § 1962(c), (Dkt. 5 ¶¶ 80–90), while the remaining Defendants Irwin, Midwest Title, EJ Investment, and Chase RE (collectively, "the § 1962(d) Defendants") violated § 1962(d), (*id.* at ¶¶ 91–96). Defendants challenge Malik's claims under both subsections. Before diving into the RICO allegations, it is worth noting that the complaints in the ten related cases pending before this Court—all describing

similar schemes to defraud other plaintiffs by the same or similar defendants[4]—give Malik's claims a plausibility boost. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) ("It is appropriate to accord limited corroborative weight to allegations in another's lawsuit.").

### A. Section 1962(c)

Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964(c) "empowers private parties to bring lawsuits against those engaged in racketeering activity when that activity has caused them harm." *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1093 (7th Cir. 2018) (citing *Rotella v. Wood*, 528 U.S. 549, 557 (2000)). To state a claim under § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *accord Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587–88 (7th Cir. 2017).

#### 1. Conduct of an Enterprise

A plaintiff's first step under § 1962(c) is to identify an "enterprise." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) (citation omitted). An "enterprise" means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Walgreen*, 719 F.3d at 853 (observing that the

---

[4] *See* Complaint, *Abbas*, No. 23-cv-01691; Complaint, *Shankar*, No. 23-cv-01469; Complaint, *Sor*, No. 23-cv-02401; Complaint, *Chen*, No. 23-cv-02520; Complaint, *Michel*, No. 23-cv-02546; Complaint, *Said*, No. 23-cv-02858; Amended Complaint, *Haynes*, No. 23-cv-01596; Complaint, *Stafford*, No. 23-cv-03173; Complaint, *Hui*, No. 23-cv-03430; Complaint, *Fernandez*, No. 23-cv-04406.

8

statutory definition of "enterprise" is construed broadly). An "association-in-fact" enterprise has "three structural features: [1] a purpose, [2] relationships among those associated with the enterprise; and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009); *Sabrina*, 869 F.3d at 588. Put simply, this type of enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Separate from the RICO enterprise, the plaintiff must point to a "person"—that is, the defendant. *Walgreen*, 719 F.3d at 853 (citing *Cedric Kushner*, 533 U.S. at 161); *see also Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004) ("Without a difference between the defendant and the 'enterprise' there can be no violation of RICO."). "[T]hat 'person' must have conducted or participated in the conduct of the *enterprise's* affairs, not just its own affairs." *Walgreen*, 719 F.3d at 854 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (cleaned up). In this context, conduct refers to a defendant's operation or management of the enterprise. *See Sabrina*, 869 F.3d at 589 (citing *Reves*, 507 U.S. at 179).

Here, Malik sufficiently pleaded an association-in-fact enterprise with purpose, relationships, and longevity. He alleges that the § 1962(c) Defendants—which no one disputes are RICO "persons"—"were associated in fact" as the "CitiPoint Enterprise." (Dkt. 5 ¶¶ 81–82). That enterprise's "primary purpose . . . was to lure and then fleece unsuspecting real estate investors" for financial gain. (*Id.* at ¶ 83). To ensure the CitiPoint Enterprise's profit at the expense of investors like Malik, its members allegedly worked on both sides of real-estate transactions. Mikosz and Chojnacki worked together from their shared office, doing business as CitiPoint (later, as Citypoint Illinois). After drawing Malik in with promises of too-good-to-be-true investment

9

opportunities, Mikosz and Chojnacki purported to represent Malik as real-estate brokers in his purchase of the Properties. After Siriano disclosed troubling information about the Properties' condition and profitability, Mikosz and Chojnacki deflected Malik's concerns, while encouraging Malik to trust their numerous and repeated misstatements that the Properties were in good condition and fully leased. Although Malik purchased the Properties for $2.1 million, Long (Chojnacki's paramour and roommate), through First National and Prairie Raynor, bought the Properties for $1.55 million 11 months earlier before reselling it to Malik at a $550,000 profit. Behind the scenes, Irwin helped pulled the strings on the complex web of "puppet entities" that helped shield the conflicts of interest from view.

The sophisticated coordination and relationships among Defendants on both sides of Malik's purchase reflect "an unusual degree of economic interdependence" that helps nudge the existence of the CitiPoint Enterprise across the plausibility threshold. *See Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015); *see also, e.g.*, *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384, 388–89 (7th Cir. 2010) (holding that the plaintiff adequately alleged an enterprise by pointing to a coordinated fraudulent scheme); *cf. Walgreen*, 719 F.3d at 855 ("RICO does not penalize parallel, uncoordinated fraud." (citing *Boyle*, 556 U.S. at 947 n.4)). Indeed, that coordination appears essential to the success of the alleged scheme. Rather than "a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest," therefore, the CitiPoint Enterprise looks more like a "truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *See Bible*, 799 F.3d at 655–56. Moreover, the alleged CitiPoint Enterprise lasted long enough for its members to pursue the enterprise's purpose of attracting investors and profiting from their purchases. *See Walgreen*, 719 F.3d at 853 (citing *Boyle*, 556 U.S. at 946). After Malik

closed on the Properties, Defendants continued to offer him additional properties. Defendants have allegedly scammed at least four other investors like Malik.

Defendants contend that Malik has failed to plead a distinct enterprise because there is "complete identity between the alleged 'persons' and the alleged members of the 'enterprise.'" (Dkt. 59-1 at 7); *see Baker*, 357 F.3d at 692. This argument rests on the mistaken view that an enterprise's members cannot be named as defendants. Of course, an entity cannot be liable under RICO for "operat[ing] *itself* unlawfully." *See Baker*, 357 F.3d at 691–92; *Walgreen*, 719 F.3d at 854; *see also Haroco, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 747 F.2d 384, 402 (7th Cir. 1984), *aff'd on other grounds*, 473 U.S. 606 (1985). Yet, a plaintiff may state a RICO claim against each member of an association-in-fact enterprise. *See Haroco*, 747 F.2d at 401 ("Where persons associate 'in fact' for criminal purposes . . . each person may be held liable under RICO for his, her, or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity.").

To satisfy RICO's distinctness requirement, the enterprise can "be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization)" separate from the "person." *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985); *see also Cedric Kushner*, 533 U.S. at 162–63 ("The corporate owner/employee, a natural person is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." (citing *McCullough*, 757 F.2d at 144)). Malik's allegations suggest that the CitiPoint Enterprise is distinct from each of the § 1962(c) Defendants who served as members. Unlike the enterprise's members—who are "persons," capable of holding property—the CitiPoint Enterprise is a network of individuals and entities, associated in fact, and thus unable to

11

"hold any interest in property or even be brought into court." *See Haroco*, 747 F.2d at 401. Accordingly, Malik has alleged the existence of a distinct enterprise.

Malik has also plausibly alleged that the § 1962(c) Defendants participated in operating or managing the CitiPoint Enterprise's affairs. *See Sabrina*, 869 F.3d at 589 ("[T]o satisfy the 'conduct' element, a plaintiff must allege that the defendant participated in the operation or management of the enterprise itself, and that the defendant played some part in directing the enterprise's affairs." (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727–28 (7th Cir. 1998))) (cleaned up); *Reves*, 507 U.S. at 179; *see also Bible*, 799 F.3d at 657. The precise hierarchy of the CitiPoint Enterprise may be unclear. Yet, Malik has alleged that Chojnacki and Mikosz, through Citypoint Illinois, attracted and purported to represent unwitting investors while Long, through First National and Prairie Raynor, purchased and resold properties to those investors. These allegations permit a reasonable inference that the § 1962(c) Defendants held leadership roles and took part in directing the enterprise.

## 2. Pattern of Racketeering Activity

A pattern of racketeering activity requires the completion of at least two predicate acts within ten years. *Bible*, 799 F.3d at 659; 18 U.S.C. § 1961(5). The two violations "must exhibit continuity plus relationship. Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sabrina*, 869 F.3d at 589 (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016)) (cleaned up); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Continuity is 'centrally a temporal concept.'" *Empress*, 831 F.3d at 828 (quoting *H.J.*, 492 U.S. at 242). Analytically, "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past

conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J.*, 492 U.S. at 241).

While Defendants do not challenge Malik's satisfaction of the relationship-plus-continuity test, they argue that Malik has failed to adequately plead predicate acts. (Dkt. 59-1 at 7–11). As predicate acts, Malik alleges mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (Dkt. 5 ¶¶ 86–87). "The elements of mail fraud are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." *Bible*, 799 F.3d at 657 (quoting *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298–99 (7th Cir. 2003)) (cleaned up); 18 U.S.C. § 1341. Wire fraud has the same elements, except that the defendant must use interstate wires instead of mail to further the scheme. *Bible*, 799 F.3d at 657 (citing *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011)); 18 U.S.C. § 1343.

Malik's allegations of mail and wire fraud are subject to Rule 9(b)'s particularity requirement. *See Bible*, 799 F.3d at 658; Fed. R. Civ. P. 9(b). At a minimum, therefore, Malik must "describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Bible*, 799 F.3d at 658 (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001)).Yet, Rule 9(b) does not demand "form for form's sake": "although 'plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts,' they still must 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Pirelli*, 631 F.3d at 442 (internal quotation omitted). The requisite level of detail may vary from case to case. *Id.* (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998)). Since

13

"fair notice is the 'most basic consideration underlying Rule 9(b),'" in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777–78 (7th Cir. 1994)).

Malik alleges that "Defendants placed ads on the Internet and on social media with the intent to induce investors to participate in 'directly sourced' real estate opportunities." (Dkt. 5 ¶ 87(a)). Yet, Defendants "actually intended to sell the duped investor their own significantly marked-up property." (*Id.*) Malik alleges further that Defendants engaged in a "sustained fiction," "replete with misrepresentations and calculated omissions" to mislead Malik into believing that they were buying property from an "old retiring couple" at a bargain. (*Id.* at ¶ 87(b)). Malik's RICO Count incorporates his previous, more detailed allegations. (*See id.* at 14). While some of these allegations lump Defendants together, others describe the "who, what, when, where, and how" of the fraud.

In August 2022, using wired communication, Mikosz replied to Malik's response to a social media advertisement for CitiPoint (now Citypoint Illinois). (*Id.* at ¶¶ 18–20). From Illinois, Mikosz told Malik, in California, that CitiPoint could help him buy underperforming real estate from "local landlord[s]" and make "substantial cash flow" with proper management. (*Id.* at ¶¶ 19–23). Malik and Mikosz engaged in a sustained text and phone interaction where Mikosz assured Malik that she assists "out-of-state buyers, mainly [in] California purchase" "underperforming" apartment buildings owned and self-managed by "local landlord[s]." (*Id.* at ¶¶ 20, 22). Mikosz and Chojnacki sent Malik email correspondence from email addresses at the domain, "@mychaseagent.com," including a cash flow analysis showing that the Property would be profitable at a purchase price of $2.1 million. (*Id.* at ¶¶ 27, 30). In order to deflect Malik from their

failure to provide rental and financial information, on November 30, 2022, Mikosz wrote Malik that "You paying (sic.) Almost $1M less of what this building is worth." (*Id.* at ¶¶ 36, 38; Dkt. 5-5). Moreover, Mikosz represented that Malik could expect "substantial cash flow" if he hired Mainstreet to manage the properties. (*Id.* at ¶ 23). Malik alleges Mikosz made these false statements with intent to defraud him. (*Id.* at ¶¶ 87, 97); *see Bible*, 799 F.3d at 658 (observing that fraudulent intent "may be alleged generally" (citing Fed. R. Civ. P. 9(b))). Believing the seller was a local landlord, Malik agreed to the purchase on November 7, 2022. (*Id.* at ¶ 34). But in truth, the seller was Prairie Raynor, owned and controlled by Chojnacki. (*Id.* at ¶ 33). The price was not a bargain because Prairie Raynor purchased the Property for about $1.55 million eleven months prior to selling it to Malik for $2.1 million. (*Id.* at ¶¶ 62–64).

Long, using First National and Prairie Raynor, participated in the alleged fraud by purchasing the Properties in early 2022, and closing on the sale with Malik in December 2022. (*Id.* at ¶¶ 6, 34, 62–63). Considering Long's relationship with Chojnacki, it is plausible to infer that she—and by extension, her LLCs—contributed to the scheme with fraudulent intent. Malik's well-pleaded allegations add up to at least two plausible instances of wire fraud—a sufficient pattern of racketeering activity. *See Empress*, 831 F.3d at 827 ("Each use of the wires can be an individual count of wire fraud and an individual RICO predicate for the purpose of establishing two predicate acts.").[5] Accordingly, Malik's § 1962(c) claim survives.

### B. Section 1962(d)

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To state a claim under § 1962(d), a plaintiff "must allege that the defendant (1) agreed to maintain an interest in or control

---

[5] Malik alleges that "[t]he CitiPoint Enterprise conducted its racketeering activity, in part, . . . through the mailing of checks." (Dkt. 5 ¶ 85).

15

of an enterprise, or to participate in an enterprise's affairs, (2) through a pattern of racketeering activity, and (3) that the defendant agreed that some member of the conspiracy (not necessarily the defendant herself) would commit at least two predicate acts in furtherance of those goals." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017) (citing *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011)). Subsection (d)'s concern is "the agreement to participate in an endeavor, which if completed would violate a substantive provision of the Act." *Id.* (citing *Goren*, 847 F.3d at 731–32); *see also Empress*, 831 F.3d at 822–23 ("As with any conspiracy, a RICO conspirator 'must intend to further an endeavor which, if completed, would satisfy all elements of a substantive criminal offense, but it suffices that he would adopt the goal of furthering or facilitating the criminal endeavor.'" (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997))); *Domanus*, 847 F.3d at 479. Here, that substantive provision is subsection (c).

Defendants argue that Malik's § 1962(d) claim fails because their § 1962(c) claim is deficient. (Dkt. 52 at 6–7); *see, e.g.*, *Patel v. Mahajan*, 2012 WL 3234397, at *5 (N.D. Ill. Aug. 6, 2012) ("When a § 1962(c) claim fails, a § 1962(d) claim premised on the same facts fails as well." (collecting cases)). Yet, Malik has stated a claim under § 1962(c). Defendants raise no other arguments against Malik's § 1962(d) claim, and the Court declines to invent arguments on their behalf. *See Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel." (quoting *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011))). Thus, Count I may proceed in its entirety.

## II. State-Law Claims (Counts II–VI)

In Malik's remaining claims under state law, he alleges common-law fraud (Count II); breach of contract (Counts III & IV(A)); violation of the ICFA (Count IV(B)); violation of the IRELA (Count V); and negligent misrepresentation (Count VI). (Dkt. 5 ¶¶ 100–41).

### A. Fraud, ICFA, IRELA, and Negligent Misrepresentation

With scant citations to caselaw, the Chase RE Defendants contend that Counts II, IV(B), V, and VI sound in fraud, and these claims fail to meet Rule 9(b)'s heightened pleading requirement "for the same reasons" as Malik's RICO claim. (Dkt. 59-1 at 11–14). Again, Malik has stated a RICO claim, and the Court need not invent arguments for Defendants. *See Hicks*, 871 F.3d at 531. By failing to develop further arguments on the sufficiency of these state-law claims, the Chase RE Defendants have waived any arguments they might have made. *See Wernstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005); *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023).

### B. Breach of Contract

Like the Chase RE Defendants, Prairie Raynor argues—and Malik appears to concede, (Dkt. 70 at 2–3)—that because the breach-of-contract claims in Counts III and IV(A) sound in fraud, they are subject to Rule 9(b)'s heightened pleading standard. (Dkt. 62 at 2, 5). Even so, Malik's breach-of-contract claims are viable. To state a claim for breach of contract under Illinois law, a plaintiff must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) damages." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 883 (7th Cir. 2022) (citing *Babbitt Muns., Inc. v. Health Care Serv. Corp.*, 64 N.E.3d 1178, 1186 (Ill. App. Ct. 2016)).

In Count III, Malik claims Prairie Raynor breached its covenant in the purchase agreement for the Properties stating that it was not aware of any building-code violations. In the agreement, Prairie Raynor promised that it had "not received written notice from any governmental body or owner association regarding . . . zoning, building, fire or health code violations that have not been corrected." (Dkt. 5 ¶ 108). Yet, after entering into this valid contract, Malik learned that Prairie Raynor's promise was false. For months before the deal, the city had "direct[ed] building code violations at the Defendants." (*Id.* at ¶ 74). Presumably, Prairie Raynor was aware of those violations—permitting a plausible inference that it breached the purchase agreement. That alleged breach made the Properties unrentable. (*Id.* at ¶ 76). These allegations state a plausible claim for breach of contract.

Then, in Count IV(A), Malik claims Prairie Raynor breached the same purchase agreement—specifically, the obligation to provide a rent roll at closing—by providing a fabricated rent roll. (*Id.* at ¶¶ 114–15). Implicit in every contract under Illinois law is a duty of good faith and fair dealing. *Barwin v. Village of Oak Park*, 54 F.4th 443, 454 (7th Cir. 2022) (internal citation omitted); *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 690 (Ill. 1958). Despite Prairie Raynor's argument to the contrary, (Dkt. 62 at 5–6), providing a fabricated rent roll does not indicate good-faith performance of Prairie Raynor's obligation; it is a plausible breach. *See, e.g.*, *Burger v. Spark Energy Gas, LLC*, 507 F. Supp. 3d 982, 990 (N.D. Ill. 2020) (observing that the duty of good faith and fair dealing may support a breach-of-contract claim). So Malik has stated a claim for breach of contract in Count IV(A).

Prairie Raynor argues that both of Malik's breach-of-contract claims fail because Malik had knowledge of the Properties' condition—specifically the tenant occupancy and building code violations—before closing. (*See* Dkt. 62 at 4–6). This argument sounds in waiver, an affirmative

18

defense. *See Hartford Acc. & Indem. Co. v. D. F. Bast, Inc.*, 372 N.E.2d 829, 831–32 (Ill. App. Ct. 1977). Defendants may "bring a motion to dismiss on the basis of an affirmative defense only if that affirmative defense appears on the face of the complaint." *Thiele Kaolin, Inc. v. Wis. Cent. LTD.*, 645 F. Supp. 3d 860, 864 (N.D. Ill. 2022) (quoting *766347 Ontario Ltd. v. Zurich Cap. Mkts., Inc.*, 249 F. Supp. 2d 974, 985 (N.D. Ill. 2003)); *accord Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993). Indeed, Malik has no obligation to "anticipate or plead around affirmative defenses." *Thiele Kaolin*, 645 F. Supp. At 864 (quoting *Arnold v. Janssen Pharmaceutica, Inc.*, 215 F. Supp. 2d 951, 956 (N.D. Ill. 2002)); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citing Fed. R. Civ. P. 8(c)).

According to the Amended Complaint, Malik's pre-closing knowledge of the building code violations and tenant issues stems from two communications with Siriano, an employee of Chojnacki's property-management company. (Dkt. 5 ¶ 48). During a December 26, 2022 phone call three days before closing, Malik alleges, Siriano "inadvertently" told Malik the property was not fully leased. (*Id.* at ¶ 49). After Chojnacki and Mikosz assured Malik that Siriano was wrong, Malik spoke to Siriano one more time on the day of closing. (*Id.* at ¶ 59). Siriano told Malik the buildings were not cleared for transfer due to numerous code violations. (*Id.*) When Malik confronted Mikosz again, she represented that only small repairs totaling $6,000 were necessary. (*Id.* at ¶ 60). After Siriano alerted Malik to these issues, Malik caved to pressure by Mikosz and Chojnacki, and he agreed to close on the purchase with escrow funds to cover repairs and evictions. (*Id.* at ¶¶ 60–61).

Construing these allegations in the light most favorable to Malik, he has still pleaded viable breach-of-contract claims. Though Malik has not addressed Prairie Raynor's waiver argument, (*see generally* Dkt. 70), the Amended Complaint speaks for itself. Malik's conversations with

Siriano do not demonstrate that Malik had complete information about the code violations or occupancy issues before closing. Rather, he allegedly received conflicting information from Mikosz and Chojnacki, who insisted that the Properties were up to code and the rent roll was accurate. It is not clear from the face of the Amended Complaint that Malik waived his right to enforce Prairie Raynor's promises by closing on the purchase or entering the escrow agreements. Nor has Prairie Raynor pointed to any language in the escrow agreements effecting such a waiver. For now, the breach-of-contract claims survive.

## CONCLUSION

For the reasons above, Defendants' Motions to Dismiss [59, 62] are denied in their entirety. Malik's claims in Counts I–VI may move forward consistent with this Opinion.

_____
Virginia M. Kendall
United States District Judge

Date: December 6, 2023